UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

===================================

MARK CARLSON,

                              Plaintiff,

                                                          **DECISION AND ORDER**
                                                          11-CV-626A

             v.


MEDCO HEALTH SOLUTIONS, INC. et al.,

                              Defendants.

===================================

I.      **INTRODUCTION**

        Pending before the Court is a motion by plaintiff Mark Carlson for a

preliminary injunction against his former employer, defendant Medco Health

Solutions, Inc. ("Medco"),[1] pursuant to Rule 65 of the Federal Rules of Civil

Procedure ("FRCP").  Plaintiff seeks to enjoin Medco from enforcing covenants

against disclosure and competitive employment that he entered when he joined

the company in 1991.  Plaintiff asserts that these covenants are invalid and are

preventing him from pursuing an unspecified job opportunity to which he must

respond as soon as possible.  According to plaintiff, he will suffer irreparable

harm if these invalid restrictive covenants cost him this opportunity and similar

_____

        [1] The record indicates that the other named defendants, Porex
Technologies, Medco Containment Services, Inc., and Paid Prescriptions, Inc.,
are corporate predecessors or affiliates of Medco.  Accordingly, the Court will
refer to all of the defendants collectively as "Medco."

ones that may arise.  Medco counters that the covenants are reasonable, that plaintiff's assertions about his job opportunity are too vague, and that plaintiff cannot establish irreparable harm given other types of employment opportunities that he can pursue.

The Court held oral argument on August 11, 2011.  For the reasons below, the Court denies plaintiff's motion.

## II.     BACKGROUND

This case concerns allegations that invalid employment covenants are hampering plaintiff's efforts to find new work after Medco fired him.  Plaintiff, a New York resident, is a licensed pharmacist.  Medco, based in New Jersey, is a pharmacy benefits manager that does business in the United States, Puerto Rico, and Canada, as well as other areas.  Among other services, Medco provides two services to its customers.  Medco operates pharmacies that fill prescriptions in accordance with pharmacy benefit plans that its employer clients may extend to their employees.  Related to the pharmacy service, Medco performs a service called coverage review.  In short, coverage review consists of analyzing prescriptions that employees submit to their employers to determine whether the employees' pharmacy benefit plans cover those prescriptions.  Partly because Medco fills more than 108 million prescriptions per year, and partly because different clients offer different benefits plans to their employees, Medco uses a complex and computerized "rules engine" to perform its coverage review.  Medco

owns patents for its rules engine and asserts that many details of its operation are proprietary.

Plaintiff and Medco began their relationship when Medco hired plaintiff in April 1991.  Originally, Medco hired plaintiff to work as a mail-order pharmacist at a facility in Ohio.  When plaintiff began with Medco, the parties entered an employment contract called a Key Employee Agreement (the "Agreement") that would be governed by Ohio law.  The Agreement established that plaintiff was an employee at will and could be terminated at any time at Medco's discretion. Section 1 of the Agreement set forth that any ideas or inventions that plaintiff conceived during his employment would belong to Medco.  Section 5 consisted of a non-disclosure covenant.  Through this covenant, plaintiff agreed never to disclose proprietary information or customer information, and not to target actual or potential customers of Medco for one year following termination.  Section 6 consisted of a non-compete covenant.  Through this covenant, plaintiff agreed to a one-year moratorium on employment with any other pharmacy benefits company to perform services similar to whatever he was performing in the year preceding any termination.  Because Section 6 is central to plaintiff's pending motion, the Court will quote the relevant language here in full:

> During the term of my employment and for a period of one (1) year after termination, for any reason, of my employment, absent the Employer's prior written approval, I will not (as principal, agent, employee, consultant or otherwise), directly or indirectly, engage in the United States of America, its territories and possessions,

including Puerto Rico and in the Dominion of Canada (the "Territory")
in activities (similar to those in which I shall have engaged for the
Employer during the one (1) year period prior to such termination)
with, nor render services (similar to those which I shall have
rendered for the Employer during such one (1) year period) to, any
firm or business engaged or about to become engaged in the
Territory in the independent third party prescription drug claims
business or marketing to funded medical benefit plans prescription
drug benefits or any other business in which the Employer or any
affiliate, subsidiary or associate company is then engaged.

(Dkt. No. 1-2 at 17.)

Plaintiff's responsibilities at Medco increased as time passed.  Although

plaintiff began at Medco as a mail-order pharmacist, he gradually became more

involved in the coverage review process and the use of the rules engine.  Around

2003, plaintiff became Senior Director of Operations for Coverage Review and

supervised the entire coverage review process.  Medco was paying plaintiff an

annual salary of $303,000 to work with and to supervise approximately 800

employees nationwide who handled the various aspects of the coverage review

process.  The geographical layout of the coverage review process reflected the

national scope of Medco's client base.  Plaintiff worked from his home in Orchard

Park, New York; reported to Medco's vice president in Ohio; and traveled to call

centers and facilities in Ohio, Nevada, and Texas.  As part of his work

responsibilities, plaintiff was one of a small number of employees at Medco who

had special password access to the rules engine and the other confidential

details of the coverage review process.  Plaintiff held his title of Senior Director

when Medco developed a program in 2006 to address Medicare Part D

prescription claims, after Congress created Part D.

Plaintiff's employment with Medco ended abruptly after alleged mishandling

of a Medicaid audit.  The record indicates that the federal Medicaid program was

one of the pharmacy benefit plans for which Medco provided services.  In the fall

of 2010, Medicaid officials audited Medco's coverage review process for

compliance with federal regulations.  Medicaid officials identified certain

corrections that Medco had to make with respect to how it handled Medicaid

pharmacy claims.  According to Medco, plaintiff erroneously certified to Medicaid

officials that the necessary corrections had been made before they actually were

made.  Medco corrected the problem before running afoul of any federal

regulations, but blamed plaintiff for the problem and terminated him for it.  Medco

terminated plaintiff on May 21, 2011.

Plaintiff subsequently sought to nullify Sections 5 and 6 of the Agreement

to allow him to return immediately to the pharmacy benefits industry.  Originally,

plaintiff commenced litigation in New York State Supreme Court, Erie County on

July 20, 2011.  The papers that plaintiff filed that day included a verified complaint

for declaratory judgment along with an order to show cause, granted in state

court (Michalek, *J.*), for a preliminary injunction.  Among other requests for relief,

plaintiff sought a declaratory judgment that Sections 5 and 6 of the Agreement

are invalid and a preliminary injunction barring Medco from enforcing those

5

sections.  In support of the relief that he sought, plaintiff submitted a sworn

affidavit explaining that "I have received an opportunity for new employment in the

industry, and enforcement of the Restriction on Competitive Employment

provision would preclude me from taking this position, making a living, and

providing for my family.  I must respond to the prospective employer very soon."

(Dkt. No. 1-4 ¶ 34.)  Nowhere in the papers filed in state court did plaintiff explain

any details of this supposed job opportunity or the deadline for responding to it.

On July 25, 2011, the day of the scheduled hearing in state court for

plaintiff's motion for a preliminary injunction, Medco removed the case to this

Court.  On August 4, 2011, plaintiff filed the pending motion for a preliminary

injunction with this Court.  Again, plaintiff provides no details about any job

opportunity that he currently has or any deadline for responding to it.[2]  Plaintiff

relies on a more philosophical position that he "faces the possibility of being

unemployable because he will be removed from the market for a year by the

threat of enforcement of an unenforceable agreement."  (Dkt. No. 7-2 at 4.)  At

oral argument, plaintiff substantiated his argument about being removed from the

market by asserting that he has been in contact with headhunters trying to set up

---

[2] What little the Court knows about the supposed job opportunity comes
from Medco's papers, which describe the job as involving "oversight of coverage
review and appeals operations" for CVS Caremark, "a major competitor of
Medco."  (Dkt. No. 15-3 ¶ 4.)  Although plaintiff has disputed how much of
Medco's coverage review process is proprietary and how much detailed
information he ever saw, he does not dispute this description of his supposed job
opportunity.

interviews for him for jobs in the pharmacy benefits industry.  These headhunters allegedly have informed him that they have reviewed the Agreement and are aware that Medco will try to enforce it, and that plaintiff is untouchable as an applicant as a result.  As for other requirements for injunctive relief, plaintiff asserts that the geographical restrictions in Sections 5 and 6 are excessively broad, and that the type of job that he is pursuing becomes available sufficiently infrequently that he will suffer irreparable harm if he cannot pursue these opportunities when they arise.

Medco counters that plaintiff's request for injunctive relief is too speculative without more information about the supposed job opportunity.  Medco argues further that the employment restrictions in the Agreement will last for only about nine more months and apply only to coverage review, which is the work that plaintiff performed in his last year before termination.  According to Medco, plaintiff remains free to work as a pharmacist as he sees fit.  Additionally, Medco defends the geographical scope of the restrictions as matching those places where it does business.  Medco concludes its opposition to plaintiff's motion by asserting that plaintiff has failed to demonstrate why money damages cannot address any harm that he may suffer over the next nine months.

III.    **DISCUSSION**

A.    ***Preliminary Injunctions Generally***

All of the parties' arguments about Sections 5 and 6 of the Agreement

ultimately fall within the master framework for preliminary injunctions established

by FRCP 65.  "A plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that

an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008) (citations omitted).[3]  "These elements must be established

by a preponderance of the evidence."  *Procter & Gamble Co. v. Ultreo, Inc.*, 574

F. Supp. 2d 339, 344 (S.D.N.Y. 2008) (citations omitted).

B.    ***Likelihood of Success on the Merits***

"In determining whether a plaintiff has demonstrated a likelihood of success

on the merits of the ultimate case, a court is not called upon finally to decide the

---

[3] In *Winter*, the Supreme Court did not address whether it intended to eliminate an alternative to the "likelihood" requirement that had been permitted by the Second Circuit.  In the Second Circuit, plaintiffs prior to *Winter* could demonstrate either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation."  *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted).  At least for now, the Second Circuit has "found no command from the Supreme Court that would foreclose the application of our established 'serious questions' standard as a means of assessing a movant's likelihood of success on the merits."  *Id.* at 38.  As explained below, this open question will not affect the Court's analysis here because Ohio law prevents plaintiff from prevailing under either standard.

merits of the controversy.  It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief." *J.P. Morgan Secs. Inc. v. Louisiana Citizens Prop. Ins. Corp.*, No. 10 Civ. 2517, 2010 WL 1790061, at *3 (S.D.N.Y. May 3, 2010) (internal quotation marks and citation omitted); *see also S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990) ("We have observed that 'certainty' is not required, and that, with respect to the merits, the plaintiff need only make a showing that the probability of his prevailing is better than fifty percent.") (internal quotation marks and citations omitted).

Since plaintiff ultimately seeks a declaratory judgment finding Sections 5 and 6 of the Agreement invalid and unenforceable, his likelihood of success on the merits hinges on how Ohio law treats restrictions on employment.  "We hold that a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests.  A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.  Courts are empowered to modify or amend employment agreements to achieve such results." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).  "Among the factors properly to be considered are: (t)he absence or presence of limitations

9

as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment." *Id.* (citation omitted) (alteration and ellipsis in the original).  Modification of an employment agreement is not mandatory, however.  "Although a trial court may modify an unreasonable restrictive covenant to make it reasonable and enforceable, it is not required to do so."  *LCP Holding Co. v. Taylor*, 817 N.E.2d 439, 446 (Ohio Ct. App. 2004) (citation omitted).

Here, plaintiff's undisputed leadership position during his last year of employment with Medco means that this Court likely will not issue the declaratory judgment that he seeks.  During his last year of employment with Medco, plaintiff was Senior Director of Operations for Coverage Review.  Plaintiff supervised approximately 800 employees throughout the country who worked various aspects of coverage review.  The parties may disagree over the events leading to

plaintiff's termination, but they agree that plaintiff bore significant responsibility for ensuring compliance with Medicaid regulations.  Medco paid plaintiff well for the leadership position that he held, as his annual salary of $303,000 indicates. These circumstances put plaintiff in a dilemma with respect to his insistence that he has never seen or accessed any proprietary information about Medco's rules engine or any other aspect of the coverage review process.  If the Court discounts plaintiff's denials of access to proprietary information—which it is inclined to do since Medco almost certainly would not have paid plaintiff $303,000 a year for mere data entry—then upholding the non-disclosure restrictions in Section 5 would be reasonable.  Upholding Section 5 would protect the proprietary details of Medco's coverage review process that plaintiff inevitably would have seen or influenced while leading 800 coworkers employed to use that process.  In contrast, if the Court credited plaintiff's assertions that he had nothing whatsoever to do with any proprietary information in the coverage review process then plaintiff's request to strike Section 5 would make no sense.  There would be no reason to lift a restriction on disclosure if plaintiff has nothing to disclose. Under these circumstances, plaintiff has not established a likelihood that he will persuade the Court at some point to modify or to strike Section 5 of the Agreement.

Plaintiff fares no better with respect to the non-compete restrictions in Section 6 of the Agreement.  As a former leader of Medco's coverage review

department, plaintiff was in a position to direct how 800 other employees applied the coverage review process to each of Medco's clients.  Even if he did not write any software for the rules engine or engage in technical design of the coverage review process, plaintiff saw enough of the process and how it worked to be able to know how to guide the 800 coworkers whom he supervised.  *Cf. Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 992 (6th Cir. 2007) (upholding a non-compete covenant where the former employee "was a key figure in the central Ohio title insurance industry and had exposure to [plaintiff's] inner workings in Ohio") (internal quotation marks omitted).  Medco certainly thought enough of plaintiff's skill and experience with its coverage review process that it was willing to pay him $303,000 per year to direct its entire coverage review department.  *Cf. Basicomputer Corp. v. Scott*, 973 F.2d 507, 513 (6th Cir. 1992) (upholding a one-year non-compete covenant against "highly-paid managers" who "were not mere employees").  To the extent that plaintiff's former title, salary, password access, and responsibilities give evidence of his familiarity with Medco's proprietary information, they also bring into play plaintiff's concession at oral argument that Section 6 would be acceptable as is if Medco could prove that plaintiff had or took any trade secrets with him.  The one-year restriction set forth in Section 6 thus is reasonable and not in need of modification.  *See also H.R. Graphics v. Lake-Perry*, No. 70696, 1997 WL 35568, at *4 (Ohio Ct. App. Jan. 30,1997) ("The time limitation set forth by the noncompetition agreement is one year.  This court

has previously determined a one year time restriction to be reasonable.") (citation omitted).  The geographical restriction also is reasonable because it extends only to the limits of Medco's customer base and no farther.  *Cf. Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1377 (11th Cir. 1982) (affirming a geographical restriction in a preliminary injunction that encompassed Western Europe, Canada and the United States); *Premix, Inc. v. Zappitelli*, 561 F. Supp. 269, 275–76 (N.D. Ohio 1983) (upholding a non-compete clause that lacked geographical restriction but that did not leave the former employee unemployable); *Ganguly v. Mead Digital Sys.*, No. 82-1499, 1984 WL 3858, at *7 (Ohio Ct. App. Sept. 20, 1984) ("In light of the testimony that [the employer] competes in a highly competitive world-wide market, that confidential information can be quickly disseminated anywhere in the world, that the confidential information sought to be protected and the employment restricted constitutes such a narrow area of appellant's competence, experience, and expertise, we cannot say the trial court abused its discretion in upholding the restrictive agreement 'sans geographical limits.'").

Under these circumstances, plaintiff has not established a likelihood of success on the merits or sufficiently serious questions about this litigation so as to satisfy the first requirement for a preliminary injunction.

**C.    *Irreparable Harm***

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party

must show that injury is likely before the other requirements for an injunction will be considered.  To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  And, irreparable harm must be shown to be actual and imminent, not remote or speculative." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted).

Here, plaintiff's argument for a finding of irreparable harm falls short in two ways.  First, the Court has no information from plaintiff about the supposed job opportunity that is pending.  Plaintiff states repeatedly in his motion papers that he wants Section 6 of the Agreement stricken as invalid because it is preventing him from pursuing a job opportunity to which he must respond as soon as possible.  Not once, however, does plaintiff ever describe what this job opportunity is.  *Cf. Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 375 (S.D.N.Y. 2009) (finding unripe a former employee's challenge to a covenant not to recruit former co-workers, where plaintiff "has not indicated his desire or willingness to recruit any employee away from [defendant].  Even if [plaintiff] harbors a strong desire to do so, [plaintiff] has not identified any such potential recruit, and the Court is neither inclined nor permitted to guess [plaintiff's] recruitment strategy and target."); *Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 681 (S.D.N.Y. 2009) ("[P]laintiffs' claims about their inability to take advantage of

14

employment and business opportunities are vague and unsubstantiated.  Without any detail about what specific opportunities existed with what prospective employers or co-venturers, it is impossible to evaluate the extent to which they were substantial or, if they were, the reasons they have not been pursued.").  Only from Medco's papers does the Court glean that plaintiff has been offered a coverage review supervisory position with CVS Caremark, and that CVS Caremark is a rival of Medco.  Without information from plaintiff detailing why the pending job opportunity is unique and has no simple monetary value, the Court is left with a hypothetical question about job opportunities that is not ripe for review. *See U.S. v. Broadcast Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) ("An issue is ripe for judicial resolution only if it presents a real, substantial controversy, not a mere hypothetical question.  Pursuant to [the] ripeness doctrine, we must avoid entangling ourselves in abstract disagreements and engaging in premature adjudication.") (internal quotation marks and citations omitted).

Second, to the extent that plaintiff has presented an issue that is ripe for review, he has not established the inadequacy of money damages.  "We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual."  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974); *see also Savage v.*

15

*Gorski*, 850 F.2d 64, 67 (2d Cir. 1988) ("Loss of employment does not in and of itself constitute irreparable injury.") (citing *Sampson*); *Murray v. N.Y.*, 604 F. Supp. 2d 581, 585 (W.D.N.Y. 2009) (Larimer, *J.*) (quoting *Savage*).  Plaintiff's situation falls under this case law.  Medco terminated him on May 20, 2011.  Section 6 of the Agreement prohibits plaintiff from pursuing employment similar to his former coverage review work for approximately another nine months.  During that time, plaintiff may pursue any other employment, including employment in line with his pharmacist training.  After those nine months, plaintiff is free to pursue whatever employment he wants related to coverage review.  If by the end of this case plaintiff establishes that Section 6 wrongfully harmed him then the remedy could be as simple as paying him his former $303,000 per year salary for a period of time established by the finder of fact.  Given the relatively short time left in the operation of Section 6, the current availability of other employment, and the apparent availability of an easy calculation of money damages, plaintiff has failed to distinguish his situation from cases declining to find irreparable harm for loss of employment.

Given that plaintiff has failed to establish a likelihood of success on the merits or irreparable harm, the Court finds that an assessment of the last two requirements for a preliminary injunction is unnecessary.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court denies plaintiff's motion for a preliminary injunction (Dkt. No. 7).  Medco shall answer the complaint within 20 days of entry of this Decision and Order.

SO ORDERED.

*s/ Richard J. Arcara*

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED:August 29, 2011